## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIFFANY ROWE,                                :
212 North Turbot Avenue,                     :
Milton, PA 17847,                            :
                                             :
     Plaintiff                       :     CIVIL ACTION NO.    4:25-CV-2001
   v.                                        :
                                             :
PRIORITY LIFE CARE, LLC,                     :
1102 Chestnut Hills Parkway,                 :
Suite 100, Fort Wayne, IN 46814             :
and                                          :
CELEBRATION VILLAS OF                        :
LEWISBURG,                                   :     Jury Trial Demanded Pursuant to
2421 Old Turnpike Road,                      :
Lewisburg, PA 17837                          :     F.R.Civ.P. No 38(b)
     Defendants.                     :

## COMPLAINT

Plaintiff, Tiffany Rowe, by and through her undersigned counsel, Joseph Leeson, III of Leeson & Leeson, brings this Complaint for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 et seq., against Defendants Priority Life Care, LLC and Celebration Villas of Lewisburg, and in support thereof avers as follows:

### I.   <u>INTRODUCTION</u>

1.    Plaintiff, Tiffany Rowe (hereinafter "Tiffany" or "Plaintiff"), brings this action against her former employer, (hereinafter, the "Defendants").

2.    This action challenges the Defendants' policy and practice of discriminating against minority employees in executive or director positions at Priority Life Care, LLC. from at least 2023 to the present, in violation of 42 U.S.C. § 1981. This policy was adopted by the most senior

executives of the company, and resulted in the targeting of minority employees, including the Plaintiff, for termination because of preconceived biases regarding race and color, and a denial of opportunities for minorities for higher level positions when compared to white employees.

3.    Defendants subjected Tiffany Rowe to retaliation and race-based harassment and discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2, *et seq.* (hereinafter "Title VII"), and of the Reconstruction Era Civil Rights Acts, as amended, 42 U.S.C. §§ 1981, *et seq.* (hereinafter "RECRA").

4.    The hostile work environment created by Defendant by and through its employees, agents, workmen, contractors, subcontractors, and/or representatives, culminated with Defendant terminating the Plaintiff, on or about February 8, 2024.

5.    Tiffany began working at the Celebration Villas of Lewisburg facility ("Facility") on or about February 7, 2023, officially taking on duties as Executive Director ("ED") on or about May 12, 2023.

6.    On or about January 16, 2023, Ms. Amanda Kramer, a white woman, was hired as the Director of Nursing ("DON") at the Facility. Tiffany's position description indicated that Tiffany, as ED, was the DON's direct supervisor, as the DON was the Nursing Department's supervisor.[1]

7.    The position description further indicated that Tiffany was "[r]esponsible for human resource related activities, including recruitment, employment of qualified staff, termination, assignment and evaluation of staff, employee relations, and in-service/continuing education."

---

[1] "Supervisory Requirements of this position are generally as follows: Oversees the activities of all departments in the facility to ensure facility goals and standards are met; **directly manages department supervisors** and administrative employees, indirectly supervises all other employees" (emphasis added).

8.      At the time that Tiffany began working as ED, the Facility had already been flagged for several state violations in the nursing department.

9.      Tiffany was repeatedly and systematically prevented from completing her job as ED. On the one hand, the DON, refused to work under the supervision of a Black woman, created obstacles, presented resistance, and sowed sabotage. On the other hand, the Defendants ignored Tiffany's recommendations, stonewalled her out of activities under her purview while deferring to the subordinate white female DON.

10.     This was a pattern of deference to a white woman due to preexisting racial bias, the DON, despite the chain of command establishing Tiffany as the decisionmaker.

11.     This deference not only undermined Tiffany's authority, but also exposed the residents of the Facility to an increased risk of injury and harm due to the incompetence of the DON.

12.     This reckless pattern discriminatory deference and resulting risk culminated in an incident on or about June 6, 2023, Tiffany learned that the DON had committed a medication mistake and then refused to follow proper reporting protocol – including refusing to report to Tiffany or the impacted residents' families.

13.     The DON had simply bypassed the proper protocols by notifying the Regional Director of Nursing and a treating doctor, despite the circumstances clearly requiring notification to families of the impacted residents and to the state.

14.     Upon receiving notice of the issues, Tiffany immediately completed the task of reporting the error to the family of the resident that received non-prescribed medication and required the DON to be present for that initial telephonic reporting.

15. When the resident passed away due to the DON's mistake, Tiffany urged PLC to suspend the DON pending investigation – an action squarely within Tiffany's responsibilities – and was told this would not happen.

16. This all occurred while the DON's insubordination, rooted in race, color, and retaliation, was allowed to flourish unchecked. While the Facility was repeatedly reprimanded for non-compliance in areas directly under the DON's purview, PLC chose to shield the DON from accountability.

17. The DON's race-, color-, and retaliation-based insubordination continued, the Facility was repeatedly reprimanded for non-compliance in areas directly under the DON's purview, and PLC repeatedly blamed Tiffany for the DON's grievous noncompliance.

18. The DON subjected Tiffany to insubordination that amounts to harassment, on the basis of Tiffany's race. When Tiffany questioned why PLC was treating the DON, as a white woman, more favorably then PLC retaliated by falsely recording notes regarding meetings for Plans of Correction in the facility as though they were "counseling" meetings doubling down on its discriminatory treatment of Tiffany.

19. Moreover, Defendant retaliated against Plaintiff Tiffany Rowe for having a meeting with the DHS Inspector to discuss Respondent's violations.

20. Indeed, this meeting arose after the DHS Inspector, acting independently and without prompting, requested to have the room cleared for a private discussion with Tiffany about the Director of Nursing (DON), the Respondent's failure to terminate the DON, and the Respondent's violations arising from the DON's incompetence.

21. Such retaliation is not only in violation of Title VII, but also the PA Whistleblower Law and 71 Pa. Stat. Ann. § 217.

22.     After allowing and supporting the DON's racism and retaliation, and carrying out its own--after Tiffany endured this campaign of undermining and scapegoating—PLC ultimately terminated the Plaintiff.

23.     As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## II.    **PARTIES**

24.     Plaintiff, Tiffany Rowe is an adult individual and citizen of the Commonwealth of Pennsylvania who currently resides in Milton, Northumberland County, Pennsylvania.

25.     Plaintiff began working for Defendant on a full-time basis, beginning in or about February of 2023 as Executive Director of Celebration Villas of Lewisburg.

26.     Defendant Priority Life Care, LLC, headquartered at 1102 Chestnut Hills Parkway, Suite 100, Fort Wayne, Indiana 46814, is a senior-living management company that owns, operates, and manages numerous assisted-living and memory-care facilities throughout the United States, including Celebration Villa of Lewisburg, located in Lewisburg, Pennsylvania. Upon information and belief, Priority Life Care exercises substantial control over the operations, staffing, supervision, and employment practices at Celebration Villa of Lewisburg, which provides assisted living, enhanced personal care, memory care, and related residential services for elderly residents. At all times relevant hereto, both Defendants were engaged in the business of providing senior-care services to the public for profit and acted jointly and severally as the employer of Plaintiff and other similarly situated employees. At all times material hereto, Defendants employed more than 500 employees.

27.    At all times material hereto, Defendant acted by and through their authorized agents, servants, workers, contractors, subcontractors and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

28.    At all times material hereto, Defendant acted as an employer within the meaning of the statutes which form the basis of this matter.

29.    At all times material hereto, Plaintiff was an employee of Defendant within the meaning of the statutes which form the basis of this matter.

### III.    JURISDICTION AND VENUE

30.    Because this case is brought under Title VII, 42 U.S.C. §§ 2000e-2, *et seq.*, this Court has federal question jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 (a)(4).

31.    Defendants Priority Life Care, LLC and Celebration Villa of Lewisburg are subject to the jurisdiction and venue of this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) because they regularly conduct business within the Commonwealth of Pennsylvania, and the acts and omissions giving rise to this action occurred within this District.

32.    Because the Defendant is subject to personal jurisdiction in this District, it "resides" in this District for venue purposes. *See* 28 U.S.C. § 1391(c)(2); therefore, venue is proper in the Middle District of Pennsylvania because Defendant resides within this District. *See* 28 U.S.C. §§ 1391(b)(1).

33.    On or about July 30, 2024, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") complaining of acts of discrimination alleged herein. Attached hereto, incorporated herein, and marked as Exhibit 1 is a true and correct copy of that Charge of Discrimination.

34.    The Charge of Discrimination was cross filed with both the PHRC and the EEOC. *See* Ex. 1.

35.    On or about July 28, 2025, the EEOC issued the Plaintiff a Notice of Right to Sue. Attached hereto, incorporated herein, and marked as Exhibit 2 is a true and correct copy of that Notice (with personal identifying information redacted).

36.    Plaintiff has fully complied with all administrative prerequisites for the commencement of this action and has exhausted her administrative remedies.

## IV.    **FACTS**

37.    Priority Life Care, LLC ("PLC") operates through a hierarchical management structure that combines centralized executive oversight with regional and facility-level administration.

38.    At the corporate level, PLC is managed by a Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, and Chief Strategy Officer, along with several Vice Presidents overseeing specific divisions such as Operations, Quality Assurance, Sales and Marketing, and Investments.

39.    Specifically, the Chief Executive Officer, Sevy Petras, and President, Bobby Petras—the co-founders of Priority Life Care, LLC ("PLC") lead the organization and sets company-wide strategy, while the Vice President of Operations, Dave Kloster, directs day-to-day operational functions and supervises the performance of the company's regional and community leadership teams.

40.    Within Priority Life Care's management structure, each senior living community or assisted living facility—such as Celebration Villas of Lewisburg—is overseen by an Executive Director ("ED").

41.    The Executive Director functions as the on-site chief administrator and is the highest-ranking managerial employee at the facility level. The position is responsible for the overall operation of the community, including compliance with all regulatory requirements, staff supervision, financial performance, resident satisfaction, and implementation of corporate policies.

42.    Although the Executive Director holds day-to-day authority over community operations, she operates under the direction and oversight of PLC's regional and corporate management, including the Regional Vice President of Operations and the Chief Operating Officer.

43.    Reporting directly to the Executive Director is the Director of Nursing (sometimes titled "Director of Clinical Services" or "Health and Wellness Director," depending on the specific facility).

44.    This multi-tiered structure allows PLC's corporate executives to maintain centralized control over strategy and compliance, while regional and local management teams execute operations at the ground level.

45.    Plaintiff Tiffany Rowe commenced her employment with Defendants on or about February 7, 2023, and assumed full responsibilities as Executive Director of Celebration Villas of Lewisburg on or about May 12, 2023.

46.    Upon officially assuming her duties on May 12, 2023, Ms. Rowe quickly discovered that she was inheriting a deeply troubled facility—one plagued by compliance failures, unsafe conditions, and staff dysfunction. Rather than shy away, she set out to correct these issues. She implemented corrective measures, opened communication with regulators, and demanded accountability. But almost immediately, she encountered resistance — not just from subordinates, but from the corporate structure itself.

47.    At the heart of that resistance was the Director of Nursing (DON), Amanda Kramer, a white subordinate who refused to recognize Ms. Rowe's authority as Executive Director. Despite being lower in the chain of command, the DON ignored directives, withheld critical information, and regularly undermined Ms. Rowe in front of staff. When Ms. Rowe tried to hold her accountable, corporate leadership sided with the DON, dismissing Ms. Rowe's legitimate supervisory actions as "micromanaging."

48.    This pattern of deference to a white subordinate over a Black supervisor became the defining feature of Ms. Rowe's employment. Each time Ms. Rowe tried to enforce compliance or exercise authority, she was met with opposition. Staff were emboldened to ignore her. Department heads circumvented her. Leadership meetings took place without her. She was systematically isolated, her decisions overruled, and her reputation quietly eroded within the company.

49.    Rather than being supported in her role, Plaintiff was met with resistance, hostility, and undermining behavior—both overt and systemic—by subordinates and leadership alike. Her ability to execute her duties as Executive Director was continuously sabotaged in favor of a white subordinate, Director of Nursing (DON) Amanda Kramer, whom Plaintiff directly supervised.

50.    From the outset, the DON refused to accept Plaintiff's authority. She consistently circumvented Plaintiff's directives, communicated insubordinately, and refused to report critical events—actions which not only violated internal protocols but also placed residents at substantial risk of harm. These actions were tolerated, enabled, and even rewarded by Defendants, who repeatedly deferred to the DON, despite her lower-ranking position and clear misconduct.

51.    The most tragic example of this pattern came early in her tenure, in June 2023, when a serious medication error by the DON led to a resident receiving the wrong prescription.

Ms. Rowe ordered the resident transferred to the hospital and the incident reported to authorities, as required by law. The DON refused to follow Plaintiff's directive, failed to notify the family or the state, and took it upon herself to report only to her own superior, bypassing Plaintiff entirely. Tragically, the resident later died in the ICU.

52.    Despite this fatal error and Plaintiff's request to suspend the DON pending investigation, Defendants refused to discipline her. Instead, Defendants criticized Plaintiff for "micromanaging" departments and instructed her to "get it together and run [her] community," while shielding the DON from any consequences.

53.    This pattern of discriminatory deference was a constant throughout Plaintiff's tenure.

54.    As noted in internal documentation, Plaintiff was blamed for operational issues directly attributable to the DON. She was denied authority over human resources decisions that her job description explicitly authorized, including disciplinary actions. Defendants' refusal to allow Plaintiff to hold the DON accountable rendered her unable to fulfill her professional obligations, thus setting her up to fail.

55.    As weeks turned into months, Plaintiff began to recognize that the obstacles and hostility she faced were not merely professional disagreements or isolated incidents of poor communication. Only later, after being informed by other employees about management's deliberate targeting of minority administrators, did it come to light that she had been subjected to discriminatory treatment on the basis of her race.

56.    During this time, every effort she made to improve operations was met with hostility. When she advocated for compliance with state regulations, she was chastised for "overstepping." When she reported the DON's misconduct, she was accused of "creating division."

When she cooperated with state inspectors, she was reprimanded for having an "off-the-record" conversation.

57.     The DON: actively interfered with Plaintiff's management of contracts and sales; undermined Plaintiff's directives in front of staff; withheld important information from Plaintiff, even during emergencies; and told others that she wanted Plaintiff "out" and would "make it happen. Despite all of this, Plaintiff had no recourse to rectify the situation and was actively prevented by executive management from proactively addressing the issues with the DON.

58.     These hostile actions were never addressed. By contrast, when Plaintiff sought to raise legitimate concerns about the DON's performance, she was chastised.

59.     The Plaintiff's suspicions were confirmed in July 2023, during a corporate leadership training in which two senior executives—Hope Roberson, a white woman, and Mark Starks, a Black man—pulled her aside. They warned her to "watch your back." They confided that Vice President Dave Kloster was actively seeking ways to remove minorities from positions of leadership at the company's facilities. They told her that Kloster "wanted her gone because she is Black."

60.     Hope Roberson was the Regional Director of Operations at Defendant PLC and Mark Starks was the Senior Vice President, Organizational Training & Development.

61.     Mark Starks communicated that VP Kloster was systematically targeting minority leaders across the company. He had begun dispatching "review teams" and regional management staff to facilities led by people of color—ostensibly to "audit" performance, but in practice, to find pretexts for removal.

62.    This pattern was unmistakable: minority Executive Directors, Regional Managers, and Department Heads were subjected to heightened scrutiny, excessive audits, and unjustified "performance improvement plans." White counterparts were not subjected to the same treatment.

63.    Even more telling, Kloster intentionally orchestrated the reviews to be conducted by Mark Starks, a black executive,—a tactic meant to create the illusion that the terminations were not racially motivated.

64.    It was, at its core, a campaign of racial cleansing within management, born of the racist belief that minorities should not be in charge.

65.    Meanwhile, the DON's misconduct continued unchecked. She ignored reporting protocols and intentionally withheld information about emergencies and misled staff to create the appearance of leadership failure.

66.    The Plaintiff repeatedly sought corporate intervention but Defendants' response was not to correct the insubordination—it was to retaliate against Ms. Rowe.

67.    In October 2023, a DHS inspector instructed Plaintiff to clear the room for a private conversation in which the inspector questioned why the DON had not been removed and directed Plaintiff to report this concern to her supervisor.

68.    After doing so, Plaintiff was reprimanded by Defendants for speaking to the inspector—a protected activity under both federal and state law.

69.    Then, on October 31, 2023, Plaintiff was placed on a Performance Improvement Plan (PIP). The PIP outlined regular oversight and support from leadership—but no meetings were ever held, and no feedback was given.

70.    Meanwhile, Defendants' leadership privately solicited staff to spy on Plaintiff and fabricate justifications for her termination. Regional Director Jennifer Brown instructed Plaintiff's

assistant to monitor her time and report any attendance-related issues, expressly stating she needed "more on Tiffany to fire her." The assistant, uncomfortable with the request, documented the coercion and informed Plaintiff.

71. By January 2024, the campaign against Ms. Rowe had escalated to outright surveillance. Her assistant, Marsha Brubaker, confided that Regional Director Jennifer Brown had instructed her to "spy on Tiffany" and report any perceived infractions. Brubaker documented that Brown admitted she "needed more on Tiffany to fire her." Ms. Rowe reported this retaliation to Human Resources, but no investigation followed.

72. Furthermore, Plaintiff reported this retaliatory surveillance to Human Resources in writing. Days later, on February 8, 2024, Plaintiff was terminated—without any follow-up on the PIP, without any formal review, and without any cause. No meetings, no warnings, no evaluation of her PIP—just a pretextual firing of the only Black Executive Director in the region.

73. The DON—whose misconduct had led to resident harm, repeated state violations, and internal staff conflict—remained employed.

74. Throughout this period, Plaintiff was the only Black Executive Director in her region. White counterparts were not subjected to surveillance, scapegoating, or undermining behavior. In fact, when Plaintiff's concerns were validated by two corporate officials—Mark Starks and Hope Roberson, both of whom warned Plaintiff that SVP Dave Kloster "wanted her gone because she is Black"—those same officials later resigned from the company due to the racially hostile environment. Evidence further shows that PLC's SVP Kloster routinely targeted leaders of color for termination and used Black executives like Starks to carry out discriminatory assessments in a pattern amounting to racial job segregation.

75.    Defendants' termination of Plaintiff was not only discriminatory but retaliatory. It followed her repeated efforts to:

- Enforce compliance with state regulations;
- Report racially motivated insubordination by the DON;
- Address internal sabotage;
- Protect resident safety;
- Report discriminatory treatment to HR and regulatory agencies.

76.    Despite her documented efforts to improve conditions at the facility, including a reduction in both the number and severity of state violations during her tenure, Plaintiff was terminated under false and pretextual grounds, while her white subordinate remained untouched.

77.    Plaintiff's race was the but-for cause of Defendants' disparate treatment, adverse actions, and eventual termination. Defendants engineered a hostile environment where she could not perform her role, actively sought to discredit her, and ultimately replaced her with someone more acceptable to their biased leadership structure.

78.    As a direct and foreseeable result of Defendants' conduct, Plaintiff suffered severe emotional and psychological trauma. Being persistently undermined, scapegoated, and devalued because of her race and color caused Plaintiff to experience ongoing anxiety, humiliation, and distress. The constant hostility in her workplace—where her authority was systematically stripped away and her professional competence was questioned solely due to racial bias—left Plaintiff in a perpetual state of fear, self-doubt, and mental exhaustion.

79.    Plaintiff endured the trauma of realizing that she was being targeted not for her performance, but because of the color of her skin. This revelation, coupled with the daily indignities of being dismissed, isolated, and retaliated against, resulted in profound emotional pain

and feelings of betrayal. She suffered panic attacks, sleeplessness, and emotional breakdowns stemming from the chronic stress of working in an environment poisoned by racism and retaliation.

80.     Plaintiff's psychological distress was further compounded by the realization that corporate leadership not only tolerated but condoned such discriminatory behavior. The betrayal of trust by her employer—whom she initially believed would support her professional growth— caused lasting harm to her mental health and well-being. The racial targeting and removal of minority leaders across the company confirmed to Plaintiff that her suffering was not an isolated incident but part of a broader, malicious pattern.

81.     Plaintiff's emotional trauma was not limited to her time of employment; it continues to this day. The damage to her reputation, the loss of her livelihood, and the emotional scars of being subjected to a racially hostile and retaliatory environment have left her with continuing depression, anxiety, and a diminished sense of self-worth. Plaintiff has had difficulty securing comparable employment because of the stigma created by Defendants' false narratives about her performance, further compounding her distress.

82.     The ongoing effects of Defendants' discriminatory and retaliatory conduct have interfered with Plaintiff's daily functioning and quality of life. She remains haunted by the fear of being unjustly targeted in future employment, struggles to trust supervisors and colleagues, and has required professional counseling to manage the psychological fallout of Defendants' actions.

### COUNT I
### DISCRIMINATION IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT ("TITLE VII")

**Tiffany Rowe**
**v.**
**Priority Life Care, LLC,**
**and**
**Celebration Villas Of**
**Lewisburg**

83.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs and incorporates the same by reference as though set forth fully herein.

84.     At all relevant times, the Defendant has been, and continues to be, an employer within the meaning of Title VII.

85.     At all relevant times, the Defendant has employed, and continues to employ, 500 or more employees.

86.     Defendant, including its agents, supervisors, managers, representatives, servants, employees, successors in interest, co-conspirators, and/or alter egos, engaged in a pattern and practice of unlawful racial harassment and discrimination, in violation of Title VII.

87.     The above-described retaliation and race-based discrimination created a racially intimidating, oppressive, hostile, and offensive work environment that interfered with Plaintiff's emotional well-being and her ability to perform her work.

88.     Defendant, at all times relevant hereto, had actual and constructive knowledge of the conduct described above.

89.     Defendant failed to take all reasonable steps to prevent retaliation and race-based discrimination from occurring, and to protect Plaintiff from retaliation and race-based discrimination.

90.     Defendant violated Title VII by failing to adequately supervise, control, or discipline, and/or otherwise penalize the conduct, acts, and failures to act as described above.

91.     Plaintiff is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendant has engaged in discriminatory practices against her which are not yet fully known. At such time as said discriminatory practices become known to her, Plaintiff will seek leave of the Court to amend this Complaint in that regard.

92.     Plaintiff has filed a Charge of Discrimination with the EEOC, a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by reference. The EEOC issued a Right to Sue Notice authorizing this lawsuit, a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by reference. Plaintiff has exhausted her administrative remedies.

93.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer, including, but not limited to, emotional distress, consisting of outrage, shock, humiliation, anxiety, and trauma, reasonably occurring and likely to occur based on the retaliation and race-based discrimination she experienced and the Defendant's failure to take prompt and appropriate remedial action; and she has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

94.     Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

95.     The outrageous conduct of Plaintiff described above was knowing, malicious and oppressive, and done with a conscious disregard of Plaintiff's rights, and with the intent to injure Plaintiff.

96.     Defendant, by and through its agents and employees acted in their capacities as the managing agents of Defendant, Defendant ratified the conduct by doing nothing despite its knowledge of the unlawful conduct, and Defendant's conduct was intentional, willful, and with reckless indifference to the rights of the Plaintiff; therefore, Plaintiff is entitled to punitive damages from Defendant.

97.     As a further direct and proximate result of Defendant's violation of Title VII, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and

conditions of the employment relationship with Defendant as has thereby incurred, and will continue to incur, legal fees and costs, and therefore Plaintiff requests that attorneys' fees be awarded pursuant to 42 U.S.C. § 1988 (b) also known as the Civil Rights Attorney's Fees Award Act of 1976.

98.     No previous application has been made for the relief requested herein.

99.     Defendant engaged in intentional, willful, wanton and wrongful conduct, and acted with reckless indifference to the rights of others which has caused Plaintiff to suffer continued mental anguish and emotional distress.

### COUNT II
### DISCRIMINATION IN VIOLATION OF THE
### RECONSTRUCTION ERA CIVIL RIGHTS ACTS
### (as amended by the Civil Rights Act of 1991) ("RECRA")
### 42 U.S.C. §§ 1981, 1983, 1985(3), 1986.

**Tiffany Rowe**
**v.**
**Priority Life Care, LLC,**
**and**
**Celebration Villas Of**
**Lewisburg**

100.     Plaintiff incorporates by reference the foregoing paragraphs, as if set forth herein in their entirety.

101.     The foregoing conduct violates 42 U.S.C. § 1981 because such conduct discriminates against the Plaintiff on the basis of her color and race.

102.     Plaintiff was employed by Defendant as an Executive Director, a position governed by a contractual employment relationship, whether express or implied.

103.     Plaintiff is an African American woman, and therefore a member of a racial minority protected under 42 U.S.C. § 1981.

104.    Defendants acting with racial animus, systematically targeted minority employees in management positions for termination and replacement with white employees, including Plaintiff. Similarly situated white employees who engaged in comparable conduct were not disciplined or terminated.

105.    As a result of Defendants' discriminatory conduct, Plaintiffs have been denied equal pay and have lost compensation and Defendants, by the above improper, unlawful, and discriminatory acts and omissions, has violated the RECRA.

106.    As a direct result of Defendants' discriminatory actions, Plaintiff's ability to perform and continue in her employment was unlawfully interfered with, culminating in her termination.

107.    Said violations were intentional, willful, and with reckless indifference to the rights of the Plaintiff.

108.    As a direct and proximate result of Defendant's violation of the RECRA, Plaintiff has sustained injuries, damages, and losses set forth herein and has incurred attorney's fees and costs.

109.    Defendant's race-based actions directly caused Plaintiff to lose her employment, wages, and benefits, and to suffer emotional distress and reputational harm.

110.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

111.    Defendant engaged in intentional, willful, wanton, and wrongful conduct, and acted with reckless indifference to the rights of others, which has caused Plaintiff to suffer continued mental anguish and emotional distress.

## COUNT III
### RETALIATION IN VIOLATION OF THE
### PENNSYLVANIA WHISTLEBLOWER LAW
*(43 P.S. § 1421 et seq.)*

**Tiffany Rowe**
**v.**
**Priority Life Care, LLC,**
**and**
**Celebration Villas Of**
**Lewisburg**

112.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

113.    At all relevant times, Defendants were "employers" within the meaning of the Pennsylvania Whistleblower Law, as they received substantial public funding through Medicaid and other state programs administered by DHS.

114.    Plaintiff, as an employee of Defendants, made a good-faith communication to an "appropriate authority," namely the Pennsylvania Department of Human Services, relating to violations of state and federal regulations designed to protect residents' health, safety, and welfare, including inadequate staffing, failure to maintain care plans, and other regulatory non-compliance.

115.    Plaintiff's report constituted protected activity under 43 P.S. § 1423(a).

116.    Defendants, through their managers and corporate officers, thereafter subjected Plaintiff to retaliation by demoting her, undermining her authority, and terminating her employment in direct response to her protected disclosure.

117.    Such retaliation violated the Pennsylvania Whistleblower Law, 43 P.S. § 1423(b).

118.    As a direct and proximate result, Plaintiff suffered lost wages, benefits, and other damages recoverable under 43 P.S. § 1425, including reinstatement, back pay, compensatory damages, attorneys' fees, and costs.

<u>COUNT IV</u>
**WRONGFUL TERMINATION IN VIOLATION**
**OF PENNSYLVANIA AND FEDERAL PUBLIC POLICY**

**Tiffany Rowe**
**v.**
**Priority Life Care, LLC,**
**and**
**Celebration Villas Of**
**Lewisburg**

119.    Plaintiff incorporates by reference all preceding paragraphs.

120.    As a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship. *Paul v. Lankenau Hospital*, 524 Pa. 90, 569 A.2d 346 (1990*); Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 88, 559 A.2d 917, 918 (1989); *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974).

121.    An exception to this rule has been recognized in the circumstances, where the discharge of an at-will employee would threaten clear mandates of public policy. *Clay*, 559 A.2d at 918; *Rutherfoord v. Presbyterian–University Hospital*, 417 Pa.Super. 316, 612 A.2d 500 (1992). *See*, *e.g., Reuther v. Fowler & Williams*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (employee cannot be discharged for serving on a jury); *Hunter v. Port Authority of Allegheny County*, 277 Pa.Super. 4, 419 A.2d 631 (1980) (pardoned convict improperly refused employment because of criminal record); *Field v. Philadelphia Electric Co.*, 388 Pa.Super. 400, 565 A.2d 1170 (1989) (employee improperly discharged for making a report required by Federal Nuclear Regulatory Commission).

122.    Here, the Defendants are statutorily required to hire a licensed, registered administrator who is responsible for the overall management of the facility. 28 Pa. Code § 201.18(e).

123.    Plaintiff, as the administrator, was required to develop policies that provide a high level of resident care in a safe environment, Plaintiff was required to evaluate the quality of resident care, identify strengths and weaknesses, and institute appropriate follow-up activities. 49 Pa. Code § 39.91(1).

124.    Plaintiff was also required to maintain open lines of communication with the governing body to assure that resources are properly allocated and that resident care is maintained at a high level. Id.

125.    Here, Plaintiff had an affirmative statutory duty to ensure the safety of the residents and employees of the nursing home.

126.    Pennsylvania public policy strongly favors the reporting and remediation of violations in long-term care facilities, including the prevention of resident neglect and abuse.

127.    By terminating Plaintiff for communicating with management to resolve issues concerning resident care and contacting DHS and reporting violations, Defendants contravened this clear mandate of public policy. See Tanay v. Encore Healthcare, 810 F. Supp. 2d 734, 741 (E.D. Pa. 2011).

128.    Defendants' termination of Plaintiff therefore constitutes wrongful discharge under Pennsylvania and Federal common law.

129.    Plaintiff seeks compensatory and punitive damages, interest, costs, attorneys' fees, and such further relief as the Court deems just and proper.

<u>**COUNT IV**</u>

**PENNSYLVANIA HUMAN RELATIONS ACT ("PHRA")**
**Tiffany Rowe**
**v.**
**Priority Life Care, LLC,**
**and**
**Celebration Villas Of**

**Lewisburg**

130.    Plaintiff incorporates by reference the foregoing paragraphs, as if set forth herein in their entirety.

131.    Defendant, by the above improper, unlawful, and discriminatory acts and omissions, has violated the PHRA.

132.    Said violations were intentional, willful, and with reckless indifference to the rights of the Plaintiff.

133.    As a direct and proximate result of Defendant's violation of the PHRA, Plaintiff has sustained injuries, damages, and losses set forth herein and has incurred attorney's fees and costs.

134.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

135.    Defendant engaged in intentional, willful, wanton, and wrongful conduct, and acted with reckless indifference to the rights of others, which has caused Plaintiff to suffer continued mental anguish and emotional distress.

<u>**RELIEF**</u>

WHEREFORE, Plaintiff demands judgment as follows:

      a. For compensatory damages and general damages according to proof at trial;

      b. For attorneys' fees pursuant to statute and costs of suit;

      c. For prejudgment interest on all amounts claimed;

      d. Punitive Damages;

      e. Such other and further relief as the Court deems just and proper;

f. Plaintiff specifically reserves the right to amend these pleadings, including the naming of additional parties, upon such information that is obtained during the course of litigation, through the process of formal discovery, to conform with the evidence, or as otherwise appropriate in the interests of justice.

g. Plaintiff specifically reserves the right to seek class certification of the claims brought in this Complaint.

FURTHER, demands judgment against Defendant for punitive damages for its willful, wanton, and outrageous disregard for the rights of Plaintiff and reckless conduct towards Plaintiff's safety.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable in this action.

Respectfully submitted,

LEESON & LEESON

BY:  *//s// Joseph F. Leeson, III*
JOSEPH F. LEESON, III, ESQUIRE
Attorney for Plaintiff
PA Bar Id. No. 328520
70 East Broad Street
Bethlehem, PA 18016
(610) 691-3320
jleeson@leeson-law.com