**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TIFFANY ROWE, | No. 4:25-CV-02001 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| PRIORITY LIFE CARE, LLC, and CELEBRATION VILLAS OF LEWISBURG, | |
| Defendants. | |

**MEMORANDUM OPINION**

**MAY 27, 2026**

## I.    BACKGROUND

On October 24, 2025, Plaintiff Tiffany Rowe ("Plaintiff") filed a five-count complaint against Defendants Priority Life Care, LLC, and Celebration Villas of Lewisburg ("Defendants") for claims arising out of the termination of her employment.[1]

On January 9, 2026, Defendants filed a motion to dismiss three of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[2] In response, Plaintiff stipulated to the dismissal of Count III.[3] On the other two Counts, the motion is now ripe for disposition.

---

[1]    Doc. 1 (Compl.).
[2]    Doc. 11 at 1.
[3]    Doc. 16-1 at 4.

For the reasons that follow, Defendants' motion is denied for Count II and granted for Count IV.[4] Plaintiff will be provided leave to amend the complaint should she care to do so.

## II.    LAW

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[5] and *Ashcroft v. Iqbal*,[6] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[7]

The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine

---

[4] To note, Plaintiff's complaint has a typographical error listing both her fourth and fifth claims as "Count IV." *See* Doc. 1 at Counts IV and IV. Defendants have moved to dismiss the wrongful termination Count IV claim, and not the PHRA claim. Accordingly, when the Court refers to "Count IV," it refers to the Count IV wrongful termination claim at issue here.

[5] 550 U.S. 544 (2007).

[6] 556 U.S. 662 (2009).

[7] *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

whether they plausibly give rise to an entitlement to relief."[8] The United States Court of Appeals for the Third Circuit clarified this point recently, stating: "a complaint need not establish a prima facie case in order to survive a motion to dismiss."[9]

### B.    Facts Alleged in the Complaint

The facts alleged in the complaint, which this Court must accept as true for the purposes of this motion, are as follows.

Defendant Priority Life Care, LLC ("PLC") is a corporate management structure that oversees regional and facility-level administration of senior-living facilities.[10] One such facility is the Celebration Villas of Lewisburg ("Celebration"), which provides assisted living and residential services for elderly residents.[11]

Plaintiff is a black woman who was hired and began working for Defendants on February 7, 2023 as Executive Director of Celebration.[12] This position is an on-site chief administrator and is the highest-ranking managerial employee at the facility level, responsible for the overall operation of the community, compliance with regulatory requirements, staff supervision, financial performance, resident satisfaction, and implementation of corporate policies.[13]

---

[8]    *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[9]    *Id.* at 788.

[10]    *Id.* at ¶¶ 26, 37.

[11]    *Id.* at ¶ 26.

[12]    *Id.* at ¶ 45.

[13]    *Id.* at ¶ 41.

When she began her employment, Plaintiff noticed multiple issues with the administration, including lack of compliance with regulations, unsafe conditions, and staff dysfunction.[14] Plaintiff attempted to correct these issues, implementing "corrective measures" and "open[ing] communication with regulators."[15] However, Plaintiff encountered "resistance, hostility, and undermining behavior" from subordinates and leadership.[16] One of the main antagonists from Plaintiff's employment tenure was the Director of Nursing ("DON") Amanda Kramer, who explicitly disregarded Plaintiff's authority and instructions.[17]

In June 2023, the DON committed a medication error, giving a resident the wrong prescription, leading to the death of the resident.[18] Plaintiff ordered the DON to be reported to authorities, but the DON bypassed Plaintiff and reported the incident instead to the DON's supervisor.[19] Plaintiff requested the suspension of the DON pending investigation, but Defendants refused and criticized Plaintiff for "micromanaging" departments.[20]

A pattern of discriminatory deference ensued, with Defendants blaming Plaintiff for operational issues committed by the DON and denying Plaintiff

---

[14]   *Id.* at ¶ 46.
[15]   *Id.* at ¶ 46. The Court notes that many of these descriptions are conclusory and do not include factual allegations to support such assertions.
[16]   *Id.* at ¶ 49.
[17]   *Id.* at ¶¶ 48-50.
[18]   *Id.* at ¶ 51.
[19]   *Id.* at ¶ 51.
[20]   *Id.* at ¶ 52.

authority over decisions that were in her job description, such as disciplinary actions.[21] Any effort Plaintiff made to improve conditions at the facility was met with hostility, and Defendants chastised Plaintiff for "overstepping" when she voiced opinions.[22]

Plaintiff was later informed by two senior executives that the Vice President of PLC was seeking ways to remove minorities from positions of leadership at the facilities and wanted Plaintiff gone because she was black.[23] The senior executives informed Plaintiff that the Vice President was systematically targeting minority leaders across the company to over scrutinize performance by minority staff and to find pretexts for removal.[24]

In October 2023, a DHS Inspector came to the facility and had a meeting with staff, where the Inspector asked Plaintiff to clear the room for a private conversation between the two of them.[25] In this meeting, the DHS Inspector asked Plaintiff why the DON had not been suspended, and directed Plaintiff to report the concern to her supervisor.[26] After doing so, Plaintiff was reprimanded by Defendants for speaking to the Inspector and placed on a Performance Improvement Plan (PIP).[27]

---

[21] *Id.* at ¶¶ 53-54.
[22] *Id.* at ¶ 56.
[23] *Id.* at ¶ 59.
[24] *Id.* at ¶ 61.
[25] *Id.* at ¶ 67.
[26] *Id.* at ¶ 67.
[27] *Id.* at ¶ 69.

Over the next months of her employment, higher level executives began to solicit staff to "spy" on Plaintiff so they could "fabricate justifications for her termination."[28] The Regional Director said she "needed more on [Plaintiff] to fire her."[29] In February 2024, Plaintiff reported this retaliation to human resources, but was not informed of any resulting investigation.[30] Plaintiff was fired on February 8, 2024, days after reporting the retaliatory surveillance.[31]

Plaintiff believed that Defendants engineered a hostile environment where she could not perform her role, actively sought to discredit her, and ultimately replaced her with someone "more acceptable" to their bias.[32]

### C. Analysis

#### 1. Section 1981 Contract

The first issue for the instant motion is whether Plaintiff's Count II, a claim under 42 U.S.C. § 1981 ("§ 1981"), is cognizable.[33] In this Count, Plaintiff asserts that Defendants' actions, namely terminating Plaintiff, impaired Plaintiff's right to contract in violation of § 1981.[34] Defendants move to dismiss this claim, arguing that Plaintiff has not adequately pled a contractual relationship.[35]

---

[28]  *Id.* at ¶ 70.
[29]  *Id.* at ¶ 71.
[30]  *Id.*
[31]  *Id.* at ¶ 72.
[32]  *Id.* at ¶ 77.
[33]  Doc. 12 at 7-9; Doc. 16-1 at 2-4; Doc. 17 at 2-4.
[34]  Doc. 1 at Count II; Doc. 16-1 at 2-4.
[35]  Doc. 12 at 7-9; Doc. 17 at 2-4.

Racial discrimination claims under § 1981 requires a plaintiff to show that "'(1) that he [or she] belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981.'"[36] One of those enumerated activities in § 1981 is the right to "make and enforce contracts," which the same statute defines as including the "making, performance, modification, and *termination* of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[37] Courts in this Circuit have repeatedly held that at-will employment is a sufficient contractual relationship to support a claim under § 1981.[38]

Defendants only dispute the third element, asserting that Plaintiff has failed to plead impairment of an enumerated activity by not attaching or pleading with

---

[36] *Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010) (quoting *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002)).

[37] 42 U.S.C. §§ 1981(a), (b) (emphasis added). In its reply brief, Defendants raise the argument that discharge is not cognizable under § 1981, relying on *Hayes v. Comm. Gen. Osteopathic Hosp.*, 730 F. Supp. 1333 (3d Cir. 1990). Doc. 17 at 3. However, that line of precedent has since been overruled, as § 1981 was amended and now explicitly includes termination as a cognizable adverse action. *See* § 1981(b); *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 383 (2004) ("The 1991 Act overturned Patterson by defining the key 'make and enforce contracts' language in § 1981 to include the 'termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'") (quoting 42 U.S.C. § 1981(b)). Accordingly, Defendants' argument that termination does not qualify as an enumeracted activity for § 1981 fails on the text of the statute.

[38] *See, e.g., McClease v. R.R. Donnelley & Sons Co.*, 226 F. Supp. 2d 695, 700-702 (E.D. Pa. 2002) (conducting statutory interpretation and analysis, collecting cases, and finding that § 1981 provides relief to at-will employees); *Olivetti v. Jewish Fed. Of NE Pa.*, No. 3:23-CV-1384, 2024 WL 555889, at *3 (M.D. Pa. Feb. 12, 2024) (citing *McClease* and finding the same); *Thomas v. Solera Senior Living, LLC*, No. 25-4944, 2025 WL 3702845, at *4 (E.D. Pa. Dec. 19, 2025) (same); *Suero v. Motorworld Auto. Grp. Inc.*, No. 3:16-CV-00686, 2017 WL 413005, at *7 (M.D. Pa. Jan. 31, 2017) (same); *Lazard v. All Restore, LLC*, 19-6040, 2021 WL 1175137, *9 (E.D. Pa. Mar. 29, 2021) (same); *Rodrigues v. Motorworld Auto. Group, Inc.*, No. 3:16-CV-1674, 2017 WL 1036477, at *4 (M.D. Pa. Mar. 17, 2017).

specificity the terms of a contract between Plaintiff and Defendants.[39] However, the Court cannot find, and Defendants have not provided, any authority suggesting that Plaintiff must plead the terms of a contract with specificity for a § 1981 claim.[40] To the contrary, the pleading standard required by the Federal Rules of Civil Procedure needs only a "short and plain statement of the claim showing that the pleader is entitled to relief,"[41] and "does not require detailed factual allegations."[42]

Here, Plaintiff has pled a sufficient employment relationship to allow her § 1981 claim to survive. Plaintiff has pled that Defendants hired her on February 7, 2023 as Executive Director, a position with enumerated duties and responsibilities.[43] Plaintiff has pled that this relationship was governed by an "express or implied" contractual employment relationship.[44] Plaintiff has pled that she worked for Defendants for a year before being terminated.[45] These pleadings demonstrate that Plaintiff was employed by Defendants, and as courts in this Circuit have repeatedly

---

[39] Doc. 12 at 7-9; Doc. 17 at 2-4.

[40] Doc. 12 at 7-9; Doc. 17 at 2-4. To note, Defendants quote *Rivera v. Dealer Funding, LLC*, for the proposition that "in the absence of attaching a contract, a plaintiff still must 'plead [a contract's] terms verbatim in order to state a claim.'" Doc. 17 at 3; 178 F. Supp. 3d 272, 276 (E.D. Pa. 2016). Amazingly, Plaintiff's quotation attempts to use *Rivera* for a conclusion opposite to the very conclusion set out in *Rivera*. *See Rivera*, 178 F. Supp. 3d at 276 ("A plaintiff *is not required to* attach the subject contract to the complaint or plead its terms verbatim in order to state a claim.") (emphasis added). Indeed, Rivera found that generally pleading an agreement's existence was sufficient to state a claim. *Id.* Defendants' misconstrual of this quotation, whether made intentionally or accidentally, is not well taken.

[41] FED. R. CIV. P. 8(a)(2).

[42] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[43] Doc. 1 at ¶¶ 41-45.

[44] *Id.* at ¶ 102.

[45] *Id.* at ¶ 72.

held that at-will employment suffices for a § 1981 claim, this is sufficient to survive Defendants' motion to dismiss.[46] As Defendants only disputed the contractual relationship element of Plaintiff's § 1981 claim, Defendants' motion to dismiss Count II is denied.

### 2.    Wrongful Termination in Violation of Public Policy

"'[T]he wrongful discharge action in Pennsylvania was judicially created to protect otherwise unprotected employees from indiscriminate discharge and to provide unorganized workers [with] legal redress against improper actions by their employers.'"[47] Only at-will employees, individuals whose employment is not governed by a contract, may "bring a common-law claim for wrongful termination."[48]

Defendants first argue that Plaintiff has not sufficiently alleged that she was an at-will employee, given that she asserts her position was "governed by a contractual employment relationship, whether express or implied."[49] Plaintiff's complaint indeed seems deliberately ambiguous about how Plaintiff was employed, and whether there was a contract governing her employment or not. Regardless, at

---

[46]   *See supra*, note 38.
[47]   *Brown v. Tucci*, 960 F. Supp. 2d 544, 587 (W.D. Pa. 2013) (quoting *Phillips v. Babcock & Wilcox*, 503 A.2d 36, 38 (Pa. Super. 1986)).
[48]   *Id.*
[49]   Doc. 12 at 16.

9

this point, it is plausible that an "implied" contractual employment relationship renders Plaintiff an at-will employee for purposes of this claim.

"Pennsylvania's at-will employment doctrine allows employers to fire workers without cause, absent a 'statutory or contractual provision to the contrary.'"[50] An exception to this rule exists where the termination violates public policy.[51] "The public policy must be expressly recognized in legislation, administrative regulations or decisions, or judicial decisions,"[52] but must not be a violation of public policy for which a remedy already exists through separate statute.[53] The Supreme Court of Pennsylvania has indicated that this public policy exception is to be strictly construed.[54]

There are three limited circumstances giving rise to a violation of public policy under this exception: 1) where the employer requires the employee to commit a crime; 2) where the employer prevents an employee from complying with a statutorily required duty; and 3) where the employer discharged an employee despite

---

[50]   *Koester v. Dairy Farmers of Am., Inc.*, 2026 WL 252741, ---F. Supp. 3d---, at *3 (M.D. Pa. 2026 (Brann, J.) (quoting *Srebro v. Dunbar Armored Inc.*, No. 3:12-CV-2136, 2013 WL 4016514, at *3 (M.D. Pa. Aug. 6, 2014)).

[51]   *McLaughlin v. Gastrointestinal Specialists, Inc.*, 561 Pa. 307, 314 (2000).

[52]   *Eaves-Voyles v. Almost Family, Inc.*, 198 F. Supp. 3d 403, 410 (M.D. Pa. 2016).

[53]   *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 522 (E.D. Pa. 2010).

[54]   *McLaughlin*, 561 Pa. at 314 ("An employee will be entitled to bring a cause of action for a termination of that relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth.").

being statutorily prohibited from doing so.[55] Plaintiff claims the second applies here, asserting that she was terminated for complying with a statutorily required duty.[56] For this avenue, "[w]here a plaintiff claims [s]he was wrongfully terminated for complying with a mandatory reporting obligation, [s]he must identify a statute that imposes a 'dut[y] and threat of penalties for failure to take the action that [she] did.'"[57]

Courts in this Circuit have come to conflicting conclusions about what level of specificity plaintiffs must demonstrate to show a statutorily imposed affirmative duty to act.[58] Plaintiff relies on the holding of *Tanay v. Encore Healthcare, LLC* to argue that a generalized duty to ensure resident and employee safety is a sufficient mandate to render her wrongful termination claim cognizable.[59] However, most other courts that have addressed the issue, including this Court, have required a delineated, clear, and direct statutory affirmative duty rather than general guidelines.[60]

---

[55] *See, e.g., Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111 (3d Cir. 2003); *Sheehan v. Everstory Partners*, 815 F. Supp. 3d 357, 383 (E.D. Pa. 2025); *Eaves-Voyles, Inc.*, 198 F. Supp. 3d at 410-11.

[56] Doc. 16-1 at 5-8.

[57] *Painadath v. Lattanzio*, No. 22-3604, 2023 WL 4628463, at *3 (E.D. Pa. July 19, 2023) (quoting *Spierling v. First Am. Home Health Servs., Inc.*, 737 A.2d 1250, 1254 (Pa. Super. Ct. 1999)) *aff'd* 2026 WL 1091646 (3d Cir. Apr. 22, 2026).

[58] *Compare Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 734, 740-41 (E.D. Pa. 2011) *with Lampenfeld v. Pyramid Healthcare, Inc.*, No. 3:14-CV-0283, 2015 WL 926154, at *11-12 (M.D. Pa. Mar. 4, 2015) (Brann, J.) (disagreeing with and distinguishing *Tanay*'s application).

[59] Doc. 16-1 at 7-8; 810 F. Supp. 2d at 740-41.

[60] *See, e.g., Lampenfeld*, 2015 WL 926154, at *11-12; *Brennan v. Cephalon, Inc.*, 298 F. App'x 147, 151 (3d Cir. 2008) (finding a plaintiff did not have a "clear and direct duty of disclosure" absent a statutorily enumerated reporting requirement); *Kent v. Keystone Human Servs.*, 68 F.

Determining which statutory mandates are "specific duties" as opposed to a "general guidelines" is a difficult question, and courts have drawn the line in varying places.[61] For example, a statute requiring mental health professionals to report suspected child abuse was found to impose an affirmative reporting duty.[62] Similarly, an employee required by the Energy Reorganization Act to report his employer's failure to comply with Nuclear Regulatory Commission regulations stated a claim for common law wrongful discharge.[63] One consideration that the Superior Court of Pennsylvania has set out is whether statutory guidelines require specific actions or if an employee may "exercise judgment" to determine the best course of compliance; the former would be a clear mandate of public policy, while the latter would not.[64]

---

Supp. 3d 565, 570 (M.D. Pa. 2014) (finding the public policy exception did not apply because "Plaintiff cites no specific statutory or administrative provision that placed upon her (or a person in her position) the affirmative duty to report Defendant's alleged violations."); *Warner v. United Natural Foods, Inc.*, 513 F. Supp. 3d 477, 485-86 (M.D. Pa. 2021) ("Pennsylvania state and federal courts have consistently dismissed wrongful termination claims premised on retaliation theories where the plaintiff had no duty to make the report he or she was allegedly fired for submitting); *United States v. Univ. of Pgh. Of Commw. Sys. of Higher Educ.*, No. 2:19-CV-01220, 2022 WL 14851121, at *5 (W.D. Pa. Oct. 26, 2022) (noting that the statute "must have an affirmative mandate to act" and that "courts have dismissed cases when a statute did not explicitly impose a reporting obligation on the medical professional to report the violation."). *Cf Eaves-Voyles*, 198 F. Supp. 3d at 411; *Nowak v. Thoroughbred Servs., Inc.*, No. 20-2540, 2021 WL 5937726, at *10 (E.D. Pa. Dec. 16, 2021) (where the plaintiff pointed to specific statutory reporting requirements for safety violations).

[61] *See id.*

[62] *Hennessy v. Santiago*, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998) (overruled in part on other grounds); *Kent v. Keystone Human Servs.*, 68 F. Supp. 3d 565, 570 (M.D. Pa. 2014) (citing *Hennessy* as an example).

[63] *Field v. Phila. Elec. Co.*, 388 Pa. Super. 400 (1989); *Brennan*, 298 F. App'x at 151 (citing *Field* as an example).

[64] *See Mikhail v. Pa. Org. for Women in Early Recovery*, 63 A.3d 313, 321 (Pa. Super. Ct. 2013).

Here, Plaintiff has not shown a statutory requirement to act with which she complied. Plaintiff points chiefly to her reporting of violations to the Pennsylvania Department of Human Services ("DHS") as the statutorily compliant action for which she was terminated.[65] As described in her complaint, the alleged retaliation occurred after Plaintiff "ha[d] a meeting with the DHS Inspector to discuss [Defendants'] violations . . . [which] arose after the DHS Inspector . . . requested to have the room cleared for a private discussion with [Plaintiff]."[66] Plaintiff's claimed statutory authority is from 49 Pa. Code § 39.91, which requires that she "[m]aintain open lines of communication with the governing body, department heads, facility staff and its residents to assure resources are properly allocated and that resident care is maintained at a high level."[67]

Unlike cases where plaintiffs complied with specific statutory reporting obligations,[68] Plaintiff's mere discussion with a government agent is not in line with any specific, statutory reporting requirement. Plaintiff has not pointed to an affirmative duty to report anything in particular to the DHS Inspector in their conversation, nor any requirement that she have that specific conversation in the first place. The requirement to "maintain open lines of communication with the

---

[65] Doc. 1 at ¶ 127; Doc. 16-1 at 6 ("… she was retaliated against and ultimately terminated for reporting issues at the nursing home to a DHS representative"), at 7-8.

[66] Doc. 1 at ¶¶ 19-20, 67-68.

[67] Doc. 16-1 at 6.

[68] *See supra*, notes 61, 62, 63.

governing body" leaves room for employee discretion in determining which conduct conforms with the statute's requirement.[69] Accordingly, Plaintiff has not shown that her conversation with the DHS Inspector qualified as conforming to a statutorily imposed duty.

Other than the DHS Inspector conversation, Plaintiff points generally to her duties to "ensure resident and employee safety, develop and enforce policies providing a high level of care, evaluate deficiencies, implement corrective action, and maintain open communication with corporate leadership" as the public policy rules she was mandated to follow. Plaintiff asserts that, "[b]y terminating Plaintiff for communicating with management to resolve issues concerning resident care and contacting DHS and reporting violations, Defendants contravened [the] clear mandate of public policy" set out in 49 Pa. Code § 39.91(1). Besides the DHS Inspector conversation, Plaintiff does not provide any examples of conduct in compliance with these rules for which she was terminated. [70] Without instances

---

[69]  *See Mikhail*, 63 A.3d at 321. Additionally, it is unclear from the statute who the "governing body" even is, and whether a DHS Inspector would qualify.

[70]  *See, e.g.,* Doc. 1 at ¶ 56 (asserting that Plaintiff "advocated for compliance with state regulations" but providing no indication of which regulations or how Plaintiff did so; asserting that Plaintiff "reported the DON's misconduct" but not explaining the circumstances of when or who and providing no statutory requirement to do so; asserting that she "cooperated with state inspectors" but seemingly only referencing the DHS Inspector conversation). In her brief in opposition to Defendants' motion to dismiss, Plaintiff argues that Plaintiff was "retaliated against and ultimately terminated for reporting issues at the nursing home to a DHS representative." Doc. 16-1 at 6. Yet, other than the one DHS Inspector conversation, Plaintiff provides no instances of her "raising compliance and safety concerns internally, cooperating with DHS inspectors, and reporting violations." Doc. 16-1 at 7-8 (citing only to Doc. 1 at ¶ 127, which circularly asserts the same).

demonstrating that Plaintiff complied with specific statutory requirements, Plaintiff's generalized assertions that she was attempting to comply with public policy are both conclusory and too generalized to meet the applicable standard for this exception.

Moreover, the requirements set out in § 39.91(1) are general guidelines leaving room for discretion. These are not direct, affirmative mandates instructing Plaintiff to conduct herself in a specific manner.[71] As such, they do not qualify as a statutorily required duty for the public policy exception. In light of the Pennsylvania Supreme Court's instruction to construe this exception narrowly,[72] Plaintiff must point to specific, statutorily enumerated responsibilities with which she complied that caused Defendants to fire her. She has not done so.

Additionally, even if the statute could be construed as creating an affirmative duty for Plaintiff to have the conversation with the DHS Inspector, this claim suffers from other deficiencies. To the extent that what Plaintiff pleads is, essentially, a racial discrimination claim, her claim would be precluded by the PHRA, as "the PHRA provides a statutory remedy that precludes assertion of a common law tort action for wrongful discharge based upon discrimination."[73] In Plaintiff's complaint,

---

[71]   For instance, one of the guidelines listed in 49 Pa. Code § 39.91 is the requirement to "[u]phold the standards of the profession of nursing home administration as prescribed in this chapter." § 39.91(2)(i). Allowing claims to be brought under these general guidelines would open a significantly larger door for wrongful termination claims.

[72]   *McLaughlin*, 561 Pa. at 314.

[73]   *Clay v. Adv. Comp. Apps. Inc.*, 559 A.2d 917, 918 (Pa. 1989); *Diberardinis-Mason v. Super Fresh*, 94 F. Supp. 2d 626, 631 (E.D. Pa. 2000); *Weaver v. Harpster*, 601 Pa. 488, 508-09

she alleges that Defendants prevented her from complying with her duties so they could have a pretext to fire her, with the motivating reason being her race.[74] Accordingly, to the extent that Plaintiff's claim is a racial discrimination claim cloaked in wrongful termination, it is precluded by the PHRA, under which she has already brought a separate claim.

Should the Plaintiff attempt to assert a wrongful termination claim independent of a discrimination claim, she must allege a sufficient causal link between a public policy mandate and her termination.[75] The only concrete instance of public policy compliance Plaintiff provides is her conversation with the DHS Inspector, but Plaintiff's pleading fails to show that this was causally linked to her termination. The conversation with the DHS Inspector occurred in October 2023; Plaintiff was fired in February 2024.[76] This is too removed in time for temporal proximity to be suggestive of causation.[77]

---

[74]   (2009) (noting that the PHRA is meant as the exclusive, explicit statutory remedy for unlawful discrimination claims); *Wolk v. Saks Fifth Ave., Inc.*, 728 F.2d 221, 222-23 (3d Cir. 1984).

[74]   Doc. 1 at ¶ 76-77 ("Plaintiff was terminated under false and pretextual grounds. . . . Plaintiff's race was the but-for cause of Defendants' disparate treatment . . . Defendants engineered a hostile environment where she could not perform her role, actively sought to discredit her, and ultimately replaced her.").

[75]   *Frymoyer v. East Penn Mfg. Co.*, 757 F. App'x 97, 100 n.2 (3d Cir. 2018) (noting that the prima facie case for wrongful termination requires a causal connection between the employee's protected activity and the termination).

[76]   Doc. 1 ¶¶ 67, 72.

[77]   *Collins v. Kimberly-Clark Pa., LLC,* 247 F. Supp. 3d 571, 602 (E.D. Pa. 2017) ("[W]ithout more, the temporal separation of one and one-half months is not particularly suggestive of a causal link.").

The only other assertion in the pleading relating to causation is Plaintiff's claim that "Defendants' termination of Plaintiff was not only discriminatory but retaliatory . . . follow[ing] her repeated efforts to . . . [r]eport discriminatory treatment to HR and regulatory agencies."[78] This paragraph is conclusory in nature, and, when examining Plaintiff's complaint in detail, the Court finds no other allegations to support it.[79] The only clear link between Plaintiff's discussion with the DHS Inspector and her later discipline is that she was "reprimanded by Defendants for speaking to the inspector . . . [and] placed on a Performance Improvement Plan (PIP)."[80] But Plaintiff has not adequately pled that her *termination* was in any part motivated by Plaintiff's discussion with the DHS Inspector.

Furthermore, Plaintiff's pleadings directly contradict the notion that her conversation with the DHS Inspector caused her firing. Plaintiff pleads that after the conversation with the DHS Inspector, Defendants' employees stated they needed "more on [Plaintiff] to fire her."[81] Moreover, Plaintiff pleads that she was fired

---

[78] Doc. 1 at ¶ 75.

[79] Besides the one conversation with the DHS Inspector, Plaintiff does not plead any other concrete examples of actions she took which were statutorily required by a public policy mandate. Plaintiff gives only generalized, conclusory assertions. *See, e.g.,* Doc. 1 at ¶ 56, *supra* note 70.

[80] Doc. 1 at ¶ 69.

[81] *Id.* at ¶ 70.

"days" after reporting "retaliatory surveillance" months after the DHS conversation, and that her "pretextual" firing was motivated by discrimination.[82]

Indeed, without the racial discrimination pleadings woven through Plaintiff's allegations, there is no causal link between her reports to the DHS Inspector and her firing. With them, her claim would be precluded by the PHRA as addressed above. Accordingly, to the extent that Plaintiff asserts a wrongful termination claim independent of her discrimination claims, she has failed to show the requisite causal link between any statutorily required affirmative duty and her termination. Defendants' motion to dismiss Count IV is granted.

## III.    CONCLUSION

Defendants' motion to dismiss is denied as to Plaintiff's Count II claim for § 1981 and granted without prejudice as to Plaintiff's Count IV claim for wrongful termination in violation of public policy.

Plaintiff is provided leave to amend her complaint. Plaintiff may file an amended complaint within fourteen (14) days of the date of this Order should she care to do so.

---

[82]    Doc. 1 at ¶ 72, 77 ("Plaintiff's race was the but-for cause of Defendants' disparate treatment, adverse actions, and eventual termination. Defendants engineered a hostile environment where she could not perform her role, actively sought to discredit her, and ultimately replaced her.").

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge